UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | | |
|---|---|---|
| SUSAN L. SMITH-HUFFMAN, | ) | CIV. 08-4046-KES |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | ORDER AFFIRMING |
| | ) | DECISION OF |
| MICHAEL J. ASTRUE, | ) | COMMISSIONER |
| Commissioner, Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff, Susan Smith-Huffman, moves the court for reversal of the
Commissioner of Social Security's (Commissioner) decision denying her
application for disability insurance benefits and supplemental security income
under Titles II and XVI of the Social Security Act.  The Commissioner opposes
the motion.  The court affirms.

## PROCEDURAL BACKGROUND

On December 11, 2002, Smith-Huffman protectively filed applications for
disability insurance benefits and supplemental security income alleging
disability since November 15, 2002.  AR 128, 625.  Smith-Huffman's
applications were denied initially and on reconsideration.  AR 81-84, 87-89.
Upon Smith-Huffman's request, Administrative Law Judge Donald Holloway
(ALJ Holloway) held a hearing on June 22, 2004.  AR 53.  On October 5, 2004,
he issued a decision finding that Smith-Huffman was not disabled within the

meaning of the Social Security Act. AR 59-74. On February 22, 2005, the Appeals Council vacated the decision of ALJ Holloway and remanded the case for further administrative proceedings. AR 79-80.

After ALJ Holloway issued his decision, but before the Appeals Council vacated and remanded, Smith-Huffman filed a new application for disability insurance benefits on October 21, 2004. AR 133-38. Her application was denied initially and on reconsideration. AR 114-16. Smith-Huffman requested a hearing before an ALJ on this application, but based on the decision of the Appeals Council remanding her initial case for further administrative proceedings, Smith-Huffman's application and request for hearing were rendered moot. AR 18. Smith-Huffman's October 21, 2004, application, as well as an application for supplemental security income dated January 23, 2006, were consolidated and considered by ALJ Lyle Olson (the ALJ) in the decision currently under review.

The ALJ held a hearing on November 16, 2005, during which Smith-Huffman, her husband, her friend Kathy Murray, and vocational expert Warren Haagenson testified. AR 694-95. On February 21, 2006, the ALJ issued a decision finding that Smith-Huffman had not been under a disability within the meaning of the Social Security Act at any time through the date of the decision, so that she was not entitled to disability insurance benefits or supplemental security income payments. AR 14-42. The Appeals Council

denied Smith-Huffman's request to review the ALJ's decision on March 17, 2008. AR 9.[1]  This appeal followed.

## FACTUAL BACKGROUND

Smith-Huffman was born on August 1, 1969, making her 33 years old at the alleged onset date and 36 years old at the time of the ALJ's decision. AR 699-700.  She is married and lives with her teenage son. AR 700. Smith-Huffman and her husband, Joe Huffman, live in different households so that Smith-Huffman can maintain eligibility for Social Services and Medicaid. AR 702.  Smith-Huffman completed 7th grade in school, and attained her GED later in life. AR 704.  She testified that she can read but has problems comprehending what she reads, so that she has to re-read things. AR 704. She also testified that her handwriting changes depending on whether she is having a good day or a bad day. AR 705.  She can do simple math, pay bills, and write checks. AR 705.

Smith-Huffman testified that she cannot remember the last job she worked. AR 706.  The record indicates that she last worked in 2002 as a housekeeper for Avera. AR 707.[2]  Smith-Huffman has also worked as a cell

---

[1] The Appeals Council considered additional evidence—a psychiatric evaluation and treatment notes from Dr. Navaid Khan and initial intake and treatment notes from Ms. Lavonne Appletoft—and a memorandum from Smith-Huffman's attorney in addition to the record.  AR 9-10.

[2] Smith-Huffman also performed volunteer work as part of Temporary Assistance for Needy Families (TANF) in December 2004 and January 2005.

phone supervisor, a dispatcher, a customer service representative, a resident care giver, and a telemarketer, but she testified that she cannot remember all of her jobs because she has trouble remembering a lot of things.  AR 180, 710.

## A.    Medical Records

Smith-Huffman has received treatment for various interrelated ailments, the most prominent of which are a history of pseudoseizures, fibromyalgia, lupus, a clotting disorder, affective and anxiety disorders, and cognitive impairment.

### 1.    Pseudoseizures

Smith-Huffman began receiving treatment for seizure-like episodes in late 2002.  On December 19, 2002, she complained to neurologist Dr. P.H. Lynch of episodes where her vision was blurred, she could not respond, she could not talk, and she experienced palpitations.  AR 225.  Dr. Lynch referred Smith-Huffman to Mincep Epilepsy Care.  AR 226.  He told Smith-Huffman not to drive until these issues were sorted out, but his records do not indicate any other limitations on Smith-Huffman's activity.  AR 226.

---

AR 708.  According to TANF Employment Specialist Steven Stager, Smith-Huffman worked on 6 different days for a total of 15 ½ hours stuffing envelopes, attaching labels, and sorting and separating printouts before being placed on exempt status.  AR 221-22.  Smith-Huffman's husband testified that Stager often sent Smith-Huffman home because she was unable to put together coherent sentences and was speaking with slurred speech.  AR 748.

In January 2003, Dr. Jeanne Beattie, of Mincep, reviewed video EEG monitoring of Smith-Huffman and concluded that her spells were nonepileptic events and likely psychogenic in etiology. AR 230-31. This conclusion was consistent with clinical psychologist Dr. Michael Schmitz's feeling that Smith-Huffman had a prolonged traumatic stress disorder and a dysthymic disorder relating to a longstanding history of sexual abuse and trauma as well as physical abuse with subsequent trauma in adult relationships. AR 260. Dr. Beattie instructed Smith-Huffman not to drive, but there is no indication of any other restrictions on Smith-Huffman's activity. AR 232.

Smith-Huffman was prescribed Depakote after a psychiatric evaluation on February 3, 2003. AR 352. On March 17, 2003, she reported that the Depakote was effective in virtually eliminating the pseudoseizures and that she had not had an episode since the week after she began taking the medication. AR 346. She was tapered off of Depakote due to significant weight gain and did not have any additional episodes. AR 556

### 2. Clotting Disorder

Smith-Huffman was treated for Factor V Leiden deficiency with deep venous thrombosis in February and March 2003. AR 273-74, 276-78. She underwent venography, balloon dilation, and stenting of the left common iliac vein at the Heart Hospital of South Dakota. AR 273-74. After being released from the hospital, Smith-Huffman had her anticoagulation adjusted. AR 372.

Dr. Richard J. Conklin concluded that she was doing better, aside from continuing fatigue.  AR 372.

### 3.    Fibromyalgia

Smith-Huffman was diagnosed with fibromyalgia syndrome in 2003.  She saw Dr. Niveditha Mohan at the Orthopedic Institute on July 1, 2003, complaining of pain in her hands and ankles, fatigue, nonrestorative sleep, and problems with memory and concentration.  AR 437.  Dr. Mohan reported, "[m]y impression is that [Smith-Huffman] has fibromyalgia syndrome, since she certainly fits criteria for the disease.  I believe her diffuse myalgia is fatigue, nonrestorative sleep, dyspareunia/pelvic pain, problems with memory and concentration all fit with the diagnosis."  AR 438.  At this initial visit, Dr. Mohan recommended low impact aerobic exercise, low doses of Flexeril and Effexor, and cognitive behavior therapy using a workbook.  AR 438.  She stated, "[c]urrently her fibromyalgia symptoms are severe enough that I believe she is completely disabled and is not a candidate for any type of gainful employment until she obtains some kind of improvement in her current symptoms."  AR 438.  Dr. Mohan concluded her report, however, "[t]he hope is that with the improvement of her fibromyalgia symptoms that she will . . . be able to resume work in the future."  AR 438.

Dr. Mohan continued to treat Smith-Huffman after the initial visit.[3]  A

follow-up visit was held on October 13, 2003.  Smith-Huffman reported that

she had increased her exercise to about 15 minutes per day and her sleep was

somewhat improved, but she had not noticed significant improvement in her

daytime fatigue and pain.  AR 472.  Dr. Mohan recommended that

Smith-Huffman continue using medication and increase her exercise.  AR 472.

Dr. Mohan noted that Smith-Huffman was not working, but did not indicate

any other functional limitations.  AR 472.  Another follow-up appointment was

held on November 5, 2003.  Smith-Huffman felt she had not improved and was

experiencing a flare-up of her fibromyalgia symptoms.  AR 471.  Dr. Mohan

encouraged Smith-Huffman to continue symptomatic management, including

medication, exercise, and cognitive behavioral therapy.  AR 471.  Again, no

functional limitations were noted.

Smith-Huffman next saw Dr. Mohan on March 22, 2004.  She reported

that her symptoms were essentially unchanged and continued to complain of

significant pain, fatigue, and sleep disturbance.  AR 465.  Dr. Mohan reported

that her symptoms "are quite consistent with fibromyalgia that is recalcitrant

to treatment."  AR 465.  Dr. Mohan ordered lab work to investigate skin lesions

---

[3] In addition to follow-up visits, the record reflects that Smith-Huffman
contacted Dr. Mohan by telephone with various concerns and ailments between
appointments.  Smith-Huffman received instructions or advice over the phone.
AR 463-64, 466, 468-69, 523-25.

and elevated inflammatory markers.  AR 465.  Smith-Huffman had another

appointment with Dr. Mohan on May 19, 2004.  Smith-Huffman reported that

she noticed improvement in some of her aches and pains after taking

prednisone and that she was able to think more clearly after increasing her

dosage of Effexor.  AR 526.  Dr. Mohan instructed Smith-Huffman to continue

her current management and noted no functional or work limitations.  AR 526.

On May 24, 2004, Dr. Mohan wrote a letter verifying that Smith-Huffman

> suffers from a medical condition that has caused significant pain
> and fatigue to the extent that she remains disabled from work.
> She has been through several interventions with medication,
> exercise, as well as other non-pharmacological means of treatment
> since last July without any significant improvement in her
> symptoms at this point.  The duration of time for which she may
> be disabled remains indefinite.

AR 461.

Dr. Mohan referred Smith-Huffman to Dr. Lisa C. Viola at Neurology

Associates, P.C.  Dr. Viola evaluated Smith-Huffman on November 2, 2004.  AR

555.  Dr. Viola believed Smith-Huffman suffered from cognitive dysfunction,

chronic fatigue, and generalized pain syndrome.  AR 555.  She noted a need to

pursue the possibility of demyelinating disease.  AR 555.  Dr. Viola gave Smith-

Huffman a trial course of intravenous steroids beginning on November 24,

2004.  AR 554.  Lynn Meyers, PA-C, Smith-Huffman's primary care provider,

contacted Dr. Viola on December 17, 2004, to report that the steroid treatment

really helped Smith-Huffman.  She was more active and was like a totally

different person.  AR 554.  On December 29, 2004, Smith-Huffman called

Dr. Viola and reported that the pain was starting to come back in her joints.

AR 554.  Smith-Huffman had a follow-up appointment with Dr. Viola on March

15, 2005.  Smith-Huffman reported that the intravenous steroid treatment

helped considerably for about a month, but she was having a recurrence of her

symptoms (memory difficulty, depression, right-side weakness, daily bouts of

fatigue, sleep paralysis, generalized pain in the joints and muscles, and

occasional headaches) to a lesser degree.  AR 553.  Again, Dr. Viola believed

that Smith-Huffman had cognitive dysfunction, chronic fatigue, and

generalized pain syndrome, but was unable to determine whether these

symptoms were related to her fibromyalgia and psychiatric disorders or a

separate issue like demyelinating disease.  AR 553.

On July 11, 2005, Smith-Huffman saw rheumatologist Dr. P. James

Eckhoff, who found tender points at 18 of 18 potential sites for fibromyalgia

tender points.  AR 612.  He concluded that his examination of Smith-Huffman

and her history supported Dr. Mohan's diagnosis of fibromyalgia and

recommended exercise and stress management strategies to manage this

condition.  AR 612-13.

On September 12, 2005, 15 months after her last appointment with

Dr. Mohan, Smith-Huffman had another appointment with Dr. Mohan.  After

this appointment, Dr. Mohan wrote a letter to Meyers, stating that

Smith-Huffman's fibromyalgia symptoms had remained stable since her last

visit. AR 618. Dr. Mohan observed rotator cuff tendinitis of Smith-Huffman's

left shoulder and gave her an injection of Depo-Medrol. AR 618. Dr. Mohan

encouraged Smith-Huffman to do range of motion exercises, quad

strengthening exercises, and regular aerobic activity. AR 618. Dr. Mohan

opined,

> I believe her main diagnoses, i.e. lupus and fibromyalgia are
> essentially a permanent condition, which will limit her ability to
> work for the long term. In the future when her symptoms are
> under better control, she may be able to do a part time job that
> does not involve any significant standing, bending, twisting, lifting,
> or kneeling. However, whenever the disease flares as she has
> demonstrated over the last few years, I believe that it will be
> difficult for her to be substantially gainfully employed with any
> type of work.

AR 618.

Dr. Mohan wrote another letter addressing Smith-Huffman's fibromyalgia

on November 11, 2005. She indicated,

> Both her lupus as well as her fibromyalgia cause significant pain
> and fatigue. Both diseases can flare and remit without any specific
> precipitating factors and both of them are still in the process of
> being actively treated. Currently because of her lupus and her
> fibromyalgia during her flares she has difficulties with pain and
> fatigue that affect her ability to stand, sit, walk, kneel, bend, twist,
> and crouch, which essentially precludes her from being able to do
> sustained work activities on a regular and continuing basis.

> My impression is that because of her underlying medical
> conditions she is not capable of being gainfully employed, the
> duration of time for which she may disabled in such a manner is
> indefinite and hard to predict at this point.

AR 620.[4]

### 4. Lupus

During Smith-Huffman's treatment for fibromyalgia, she was diagnosed with lupus. Dr. Mohan observed micropapular lesions on Smith-Huffman's forearms on October 14, 2003. On March 22, 2004, Dr. Mohan observed more skin lesions on Smith-Huffman's hands, forearms, and lower extremities and prescribed Plaquenil. AR 465. On May 19, 2004, Dr. Mohan observed that the skin lesions had improved somewhat. AR 526. In July 2005, Dr. Eckhoff found that Smith-Huffman had subacute cutaneous lupus/discoid lupus. AR 612. Though he was unsure whether Smith-Huffman should be treated with Plaquenil or chloroquine, he did state that she clearly had a sun-related skin disorder and should avoid the sun as carefully as possible. AR 612.

### 5. Affective and Anxiety Disorders

The record reveals a long history of psychiatric and psychological treatment. While undergoing evaluation at Mincep, Smith-Huffman was seen by Dr. Michael Schmitz on January 9, 2003. Dr. Schmitz found that Smith-Huffman's psychosocial history was significant for substantial and prolonged trauma. AR 265. Smith-Huffman reported that she was sexually abused by her stepfather from ages 5 through 19. He continued to rape her

---

[4] Dr. Mohan's letter dated November 11, 2005, was received after the hearing held by the ALJ.

even after she left home and married, which eventually resulted in her pregnancy with her oldest child. AR 265. Smith-Huffman and her first husband divorced, and she was married four more times. AR 266. She was physically abused by her second husband. AR 266. While she was married to her third husband, her 4-year-old child died in a house fire. AR 266. Dr. Schmitz believed Smith-Huffman suffered from prolonged posttraumatic stress disorder and dysthymic disorder and indicated a need to rule out dissociative disorder not otherwise specified. AR 268. He opined that Smith-Huffman's episodes "appear consistent with dissociative disorder, likely secondary to prolonged history of posttraumatic stress disorder." AR 268. He also stated that Smith-Huffman's unresolved psychological trauma likely contributed to her physical problems like gastrointestinal problems and lower back pain. AR 268.

Smith-Huffman underwent a psychiatric evaluation conducted by Rhonda Fliehs, CNP, and Dr. Sanjeevi Giridhar on February 4, 2003. Fliehs and Dr. Giridhar noted that Smith-Huffman was able to provide her history in great detail despite reporting memory problems. AR 351. Dr. Giridhar diagnosed Smith-Huffman with mood disorder due to non-malignant cerebellar meningioma with surgical resection[5] and posttraumatic stress disorder with

_____

[5] Smith-Huffman had a right cerebellar meningioma surgically removed in 1997. AR 267

12

the need to rule out dissociative disorder and personality disorder.  AR 351.

Dr. Giridhar directed Smith-Huffman to continue taking her current

psychiatric medication and to begin a trial of Depakote.  AR 352.

Smith-Huffman had medication reviews on February 24, 2003, and March 17,

2003.  AR 346-47.  She reported that her mood was better after starting

Depakote.  AR 347.

Another psychiatric evaluation was conducted on January 4, 2005, by

Dr. Rajesh Singh.  Dr. Singh diagnosed panic disorder with agoraphobia and

indicated a need to rule out posttraumatic stress disorder.  AR 565.  He

believed some of Smith-Huffman's symptoms might have an underlying

psychological component and indicated a need for further personality and

neuropsychological testing.  AR 565.

Kent W. Miller conducted a psychological evaluation at the request of

Disability Determination Services on March 20, 2005.  AR 566.  Miller observed

that Smith-Huffman was able to track her thoughts to their logical conclusions

and observed no evidence of memory dysfunction.  AR 570.  He diagnosed

Smith-Huffman with mood disorder due to meningioma resection and/or other

unknown lesion cause and noted a need to rule out dysthymic disorder and

posttraumatic stress disorder.  AR 571.

The most recent psychiatric evaluation in the record was conducted by

Dr. Navaid A. Khan on June 7, 2005.  Dr. Khan diagnosed Smith-Huffman with

chronic posttraumatic stress disorder, anxiety disorder, and probable severe major depressive disorder.  He also noted the need to rule out bipolar disorder. AR 643.  Dr. Khan referred Smith-Huffman to LaVonne Appletoft for counseling.  AR 643.  Appletoft's intake indicates that Smith-Huffman's thoughts were clear though somewhat unorganized and that her memory appeared to be impaired.  AR 633.  Smith-Huffman received therapy from June 30, 2005, to March 21, 2006.  AR 635-40.  Smith-Huffman canceled several appointments and failed to show up for several others.  AR 635-40. Smith-Huffman also had follow-up appointments with Dr. Khan on October 27, 2005, and March 3, 2006.  AR 644-645.  On October 27, 2005, Smith-Huffman reported significant improvements in her social life interaction and overall well-being after receiving psychotherapy and counseling.  AR 644.  She also continued to report difficulty in organization, focusing, memory, and task completion.  Dr. Khan recommended continued therapy to deal with these difficulties.  AR 644.  On March 3, 2006, Smith-Huffman reported a flare up in her lupus and another episode of depression due to various stressors.  AR 645. Dr. Khan recommended continued counseling.  AR 645.

### 6.    Cognitive Difficulties

Smith-Huffman's cognitive abilities were assessed in neuropsychological evaluations completed in January 2003 and February 2005.  While Smith-Huffman was at Mincep, psychologist Thomas E. Beniak evaluated her

on January 7, 2003. He reported that testing was interrupted by one of Smith-Huffman's spells, after which her reaction times slowed considerably. AR 234-35. Dr. Beniak found that Smith-Huffman's overall intellectual capacity fell in the uppermost end of the borderline retarded range, with her verbal measures exceeding all others. AR 235. Test findings suggested mild to moderate non-dominant hemisphere dysfunction with the additional possibility of mild bilateral mesiotemporal dysfunction. AR 237. Additionally, mild to moderate memory impairment was present. AR 237. With respect to personality, Dr. Beniak determined that Smith-Huffman's absolute level of distress and psychiatric incapacitation was mild, although chronic insecurity and emotional vulnerability suggested distinct potential for decompensation and intensification of psychiatric symptoms including depression. AR 237. Dr. Beniak also found considerable potential for moodiness, rapid change in affective status, emotional lability, and predisposition to develop chemical dependency problems. AR 237.

Psychologist Michael J. McGrath conducted another neuropsychological examination on February 21, 2005. Smith-Huffman's overall intellect fell near the midpoint of borderline range, her verbal abilities appeared to be fair to marginal, she displayed a mild impairment in terms of speed-of-information processing, her overall transient auditory and visual attentional capacity fell in the lower half of the borderline range, and her overall immediate memory

capacity was in the dull normal range.  AR 541-43.  Dr. McGrath concluded that when working with Smith-Huffman, it is important to explain information simply and concretely, to slow the rate of novel information input, to guide her reasoning of more complex information, to provide breaks in terms of information input, and to point out the more salient aspects of visual information.  AR 544.

### B.    Smith-Huffman's Testimony

At the hearing, Smith-Huffman testified that her most severe physical problem is "constant nagging pain" relating to lupus, chronic fatigue syndrome, and fibromyalgia.  AR 711.  She admitted that she has not been diagnosed with chronic fatigue syndrome, but testified that Dr. Mohan talked about this disorder with her.  AR 712.  Smith-Huffman described her daily pain as the "real, real ache" a person feels when the flu sets in, when "that first achiness starts in all your joints and bones, and when you touch your skin, it hurts."  AR 712.  She testified that the pain is throughout her entire body and is an aching, throbbing pain where every bone in her body hurts.  AR 713.  Smith-Huffman testified that she has "good days" and "bad days."  On a good day, she can get up in the morning and clean her bathroom and bedroom for 2-3 hours before she has to rest.  After a nap, she can clean part of the living room and the kitchen, but does not vacuum, sweep, or mop.  AR 716-17.  On a bad day, she can barely get out of bed.  Her legs burn and feel swollen and

heavy, and she feels sharp, stabbing pain until she gets situated and settled down.  She does not get much done on a bad day.  AR 715.  She testified that she has about 18 good days a month and 12 bad days.  AR 714-15. Smith-Huffman's husband testified that when he lived with Smith-Huffman, she had about 2 good days a week and 5 bad days.  AR 744.  On a scale of 0 to 10, where 10 is the most severe pain she has ever been in, Smith-Huffman rated her daily whole body pain at a 6 or 7 without pain medication and a 3 with medication, on a good day.  AR 713-14.  On a bad day, her pain is at an 8 or 9.  AR 715.

Smith-Huffman testified she has flare-ups of fibromyalgia where her pain becomes acute after being quiet for awhile, brought on by stress.  AR 722.  She testified that when she first started experiencing fibromyalgia, it was intolerable, but it was tolerable at the time of the hearing.  AR 723.  She also has flare-ups of lupus, brought on by exposure to sunlight.  AR 723.  Her face turns red and feels painful when she is in the sun, and she gets ulcers in her mouth and in her nose.  AR 723.  Smith-Huffman also testified that she has incontinence problems and has experienced daily headaches her entire life.  AR 724-25.  Smith-Huffman takes Naprosyn, ibuprofen, and Tylenol for pain.  AR 714.  She takes Plaquenil for lupus.  AR 718.  Smith-Huffman does not receive physical therapy for fibromyalgia, but she does do biofeedback exercise on her own.  AR 722.

Smith-Huffman also testified that she suffers from depression and other problems with her mood. The problems began around the time that her son died and she had her brain tumor removed. AR 727. She testified that the symptoms of her depression include feelings of worthlessness, low self-esteem, major crying spells, weight fluctuations, loss of appetite, loss of sexual interest, and sleep disturbance. AR 727-28. Smith-Huffman testified that she takes Effexor and participates in mental health counseling every other week. AR 728-29. At the time of the hearing, she had missed her last two sessions due to a court hearing and being unable to get out of bed. AR 729.

Smith-Huffman testified that she has become very introverted since she got sick. AR 729. She has one friend, Kathy Murray, a neighbor who checks on her and drives her to appointments. AR 730. Smith-Huffman does not drive because she is afraid of putting others in danger. AR 730. Smith-Huffman also testified that she has difficulty concentrating. AR 730-31. She is not always able to follow a storyline on a television program, cannot read things without having to re-read them, and cannot cook from a box, but she does play games on the computer with her daughter. AR 732-33. Her husband testified that she sometimes prepares a cup of coffee and immediately forgets that she made it and that the last time she tried to cook, she started boiling eggs and forgot about them to the point that the eggs exploded and the kitchen was filled with smoke. AR 744. Murray also testified that

Smith-Huffman often makes a pot of tea and forgets that she has done it. AR 753.

With respect to daily activities, Smith-Huffman testified that she is able to dress and bathe herself and do household work on good days. AR 733. She has one dog, three Marmoset monkeys, and some birds. AR 734. Smith-Huffman's son cleans the animals' cages and feeds them, but Smith-Huffman plays blocks and other games with the monkeys. AR 735. She testified that she has a hard time lifting a gallon of milk and can walk 5 minutes (about half a block) before needing to stop. AR 736. On a good day, she can stand for 15 minutes at a time, but on a bad day she needs to sit down immediately. AR 737. She can sit down for up to 4 hours if she can readjust from time to time. AR 737. She cannot touch her toes and can squat for only 30 seconds. AR 737. She can reach with both arms, button buttons, and use zippers with her fingers on a good day. AR 738.

Smith-Huffman's husband testified that he sees her on the weekends and their son takes care of her during the week. AR 743. He also testified that Smith-Huffman does not function normally. He testified that she cannot finish washing the dishes or vacuuming the floor because she gets fatigued. AR 742. When she gets tired, she has trouble forming coherent sentences and slurs her words. AR 742. Murray also testified that Smith-Huffman gets to a point where she cannot function anymore. Her eyes get funny-looking and she looks

like she has gone 2 days without sleep.  AR 754-55.  Smith-Huffman's husband

also testified that she is unable to go shopping alone because she frequently

has "spells" where she forgets where she is and why she is there.  AR 745-46.

As a result, Smith-Huffman's son does the grocery shopping.  AR 746.

Smith-Huffman's husband testified that she can be left home alone during the

day, but not for an entire weekend.  AR 749.  Murray testified that she checks

on Smith-Huffman in the mornings and sometimes in the afternoons on

weekdays.  AR 752.  Murray testified that Smith-Huffman takes at least two

naps a day.  AR 754.

### C.    Testimony of Vocational Expert

Vocational expert Haagenson also testified at the hearing.  The ALJ

asked Haagenson a series of hypothetical questions.[6]  First, Haagenson

testified that a person of the same age, education, and work experience as

Smith-Huffman who could lift and carry 20 pounds occasionally and 10

pounds frequently, stand and/or walk with normal breaks for a total of 6 hours

in an 8-hour day, and sit with normal breaks for a total of 6 hours in an 8-

hour day; who was able to understand, remember, and carry out only short

simple instructions; who had no problems interacting appropriately with the

public, supervisors, or co-workers; and who was able to respond to changes in

_____

[6] Haagenson testified that his answers were consistent with the
Dictionary of Occupational Titles.

a routine work setting only would not be able to perform any of Smith-Huffman's past work. AR 758-59. That person would be able to perform a range of light, unskilled work such as motel cleaning, parking lot attending, and ushering/ticket taking. AR 759.

Next, Haagenson testified that the same individual who was able to lift and carry 10 pounds occasionally and less than 10 pounds frequently, stand and/or walk with normal breaks for 2 hours in an 8-hour day, sit for a total of 6 hours in an 8-hour day; who could engage in postural activities on an occasional basis, but could never climb ladders, ropes, or scaffolds; who had to avoid moderate exposure to hazards such as working around and in machinery and at heights; who could understand, remember, and carry out short, simple instructions; who had no problems interacting appropriately with the public, supervisors, or co-workers; and who was able to respond to changes in a routine work setting would not be able to perform any of Smith-Huffman's past work. AR 760. But that person would be able to work sedentary, unskilled jobs such as small part assembly type occupations, food and beverage order clerk, and charge account clerk. AR 760-61. That hypothetical person could perform the same jobs even if she had to avoid concentrated exposure to sunlight or alternate between sitting and standing every 30 minutes. AR 761-62. Haagenson testified that the type of work Smith-Huffman did while volunteering through TANF would be characterized as an unskilled, sedentary

occupation.  AR 763.  Haagenson also testified that if the above hypothetical person had to take a nap either in the morning or afternoon, she would be unable to perform any of the jobs Haagenson cited.  AR 763-64.

Finally, Haagenson testified that a person of the same age, education, and past work experience as Smith-Huffman who had all of the conditions Smith-Huffman, her husband, and Murray testified to would not be able to perform Smith-Huffman's past work or any competitive employment.  AR 762-63.

## ALJ DECISION

On February 21, 2006, the ALJ issued a decision finding that Smith-Huffman had not been under a disability within the meaning of the Social Security Act from November 15, 2002, through the date of his decision.  AR 17-42.  The ALJ provided a detailed summary of Smith-Huffman's history and testimony and outlined the five-step sequential evaluation process for determining whether an individual is disabled.  AR 23-41.[7]

---

[7] "To determine disability, the Commissioner uses the familiar five-step sequential evaluation, [and] determines: (1) whether the claimant is presently engaged in a 'substantial gainful activity'; (2) whether the claimant has a severe impairment—one that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education, and work experience); (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant

At step one, the ALJ determined that Smith-Huffman had not been engaged in substantial gainful activity since November 15, 2002, the alleged onset date of her disability. AR 23. At step two, the ALJ found that Smith-Huffman had the following "severe" impairments within the meaning of the Social Security Regulations: fibromyalgia syndrome, lupus (discoid), history of pseudoseizures, Factor V Leiden deficiency with history of left leg deep vein thrombosis, borderline intellectual functioning, and affective/anxiety disorders. AR 23. At step three, the ALJ found that Smith-Huffman did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in the Social Security Regulations. AR 23-27.

The ALJ next determined Smith-Huffman's residual functional capacity (RFC). The ALJ found that Smith-Huffman retained the RFC to perform work as long as it does not require:

> [l]ifting of over 10 pounds on an occasional basis and less than 10 pounds on a frequent basis; standing and/or walking more than 2 hours in an 8-hour day; sitting more than 6 hours in an 8-hour day; climbing of ladders, ropes or scaffolds; more than occasional stair/ramp climbing, balancing, stooping, kneeling, crouching or crawling; even moderate exposure to hazards such as heights and machinery; concentrated exposure to direct sunlight; job tasks involving more than short, simple instructions and changes in the work setting which are more than routine.

AR 39.

-------------------

can perform." Baker v. Apfel, 159 F.3d 1140, 1143-44 (8th Cir. 1998) (internal footnote omitted).

In determining Smith-Huffman's RFC, the ALJ rejected the disability opinions given by Dr. Mohan and found Smith-Huffman's allegations regarding her symptoms and functional restrictions not entirely credible. AR 30-39. Based on his RFC determinations, the ALJ concluded that Smith-Huffman was unable to perform any past relevant work. AR 39. But after considering Smith-Huffman's age, education, work experience, and RFC, the ALJ found that there were jobs that existed in significant numbers in the national economy that Smith-Huffman could perform. AR 39-41. As a result, the ALJ terminated his analysis at step five and concluded that Smith-Huffman was not entitled to disability benefits. AR 41.

## STANDARD OF REVIEW

The decision of the ALJ must be upheld if substantial evidence in the record supports it as a whole. 42 U.S.C. § 405(g); Metz v. Shalala, 49 F.3d 374, 376 (8th Cir. 1995). Substantial evidence is less than a preponderance but enough evidence that a reasonable mind might find it adequate to support the conclusion. Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971); Fines v. Apfel, 149 F.3d 893 (8th Cir. 1998); Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995). Review by this court extends beyond a limited search for the existence of evidence supporting the Commissioner's decision to include giving consideration to evidence in the record which fairly detracts from the decision. Brockman v. Sullivan, 987 F.2d 1344, 1346 (8th

Cir. 1993); Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992); Turley v. Sullivan, 939 F.2d 524, 528 (8th Cir. 1991).

Under section 405(g), the court is to determine whether there is substantial evidence in the record as a whole to support the decision of the Commissioner and not to reweigh the evidence or try the issues de novo. Murphy v. Sullivan, 953 F.2d 383, 384 (8th Cir. 1992). Further, a reviewing court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993); see also Smith v. Shalala, 987 F.2d 1371, 1374 (8th Cir. 1993). The court must review the Commissioner's decision to determine if an error of law has been committed. Smith v. Sullivan, 982 F.2d 308, 311 (8th Cir. 1992); Nettles v. Schweiker, 714 F.2d 833, 836 (8th Cir. 1983). The Commissioner's conclusions of law are only persuasive, not binding, on the reviewing court. Smith v. Sullivan, 982 F.2d at 311; Satterfield v. Mathews, 483 F. Supp. 20, 22 (E.D. Ark. 1979), aff'd per curiam, 615 F.2d 1288, 1289 (8th Cir. 1980). If the ALJ's decision is supported by substantial evidence, then this court cannot reverse the decision of the ALJ even if the court would have decided it differently. Smith v. Shalala, 987 F.2d at 1374.

## DISCUSSION

Smith-Huffman argues that the ALJ erred in determining that she was not disabled at Steps 3, 4, and 5.

## I. Determination that Impairments Do Not Meet or Equal Listed Impairment

A claimant may qualify for benefits at Step 3 if she has an impairment or combination of impairments that meets or equals an impairment listed in the listing of impairments in 20 C.F.R. Part 404, Appendix 1, Subpart P.  "For a claimant to show that [her] impairment matches a listing, it must meet *all* of the specified medical criteria.  An impairment that manifests only some of those criteria, no matter how severely, does not qualify."  Sullivan v. Zebley, 493 U.S. 521, 530, 110 S. Ct. 885, 107 L. Ed. 2d 967 (1990) (emphasis in original).  Similarly, "[f]or a claimant to qualify for benefits by showing that [her] unlisted impairment, or combination of impairments, is 'equivalent' to a listed impairment, [she] must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment."  Id. at 531 (emphasis in original).  The burden of proof is on the claimant to establish that her impairment meets or equals a listing.  Johnson v. Barnhart, 390 F.3d 1067, 1070 (8th Cir. 2004).

## A.  Fibromyalgia

Smith-Huffman argues that the ALJ erred in finding that fibromyalgia does not equal any musculoskeletal impairment listed in Appendix 1.[8]  She argues that fibromyalgia is a medically recognized disorder and its effects can be as or more disabling than the listed musculoskeletal impairments, but she does not identify which musculoskeletal impairment it is that fibromyalgia equals.[9]  The Supreme Court has explicitly rejected Smith-Huffman's argument that she is entitled to benefits at Step 3 because of the overall impact of fibromyalgia.  "A claimant cannot qualify for benefits under the 'equivalence' step by showing that the overall functional impact of [her] unlisted impairment or combination of impairments is as severe as that of a listed impairment."  Sullivan, 493 U.S. at 531.  Moreover, the court has reviewed all of the musculoskeletal impairments listed in Appendix 1 and finds substantial evidence in the record to support the ALJ's finding that Smith-Huffman's fibromyalgia is not the medical equivalent of any listed impairment.  Smith-Huffman undoubtedly experiences pain and fatigue as a result of fibromyalgia,

---

[8] There is no dispute that fibromyalgia is not a listed impairment.  See Tennant v. Apfel, 224 F.3d 869, 870 (8th Cir. 2000) (per curiam).

[9] The listed musculoskeletal impairments are: major dysfunction of a joint; reconstructive surgery or surgical arthrodesis of a major weight-bearing joint; disorders of the spine; amputation; fracture of the femur, tibia, pelvis, or one or more of the tarsal bones; fracture of an upper extremity; and soft tissue injury (e.g., burns).  20 C.F.R. pt. 404, subpt. P, app. 1 §§ 1.02-1.08.

but she has not met her burden of establishing that this disorder meets or equals a listed impairment.

### B.     Affective Disorder and Anxiety Disorder

Smith-Huffman also argues that the ALJ erred in finding that her affective and anxiety disorders do not meet or equal any impairment listed in §§ 12.04 and 12.06 of Appendix 1.  Under § 12.04, Smith-Huffman must show a medically documented persistence, either continuous or intermittent, of four of the following: anhedonia or pervasive loss of interest in almost all activities; appetite disturbance with change in weight; sleep disturbance; psychomotor agitation or retardation; decreased energy; feelings of guilt or worthlessness; difficulty concentrating or thinking; thoughts of suicide; or hallucinations, delusions, or paranoid thinking.  20 C.F.R. pt. 404, subpt. P, app. 1 § 12.04(A)(1).

Under § 12.06, Smith-Huffman must show medically documented findings of at least one of the following: (1) generalized persistent anxiety accompanied by three out of four of the following: motor tension, autonomic hyperactivity, apprehensive expectation, or vigilance and scanning; (2) a persistent irrational fear of a specified object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation; (3) recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring

on the average of at least once a week; (4) recurrent obsessions or compulsions which are a source of marked distress; or (5) recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress. 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.06(A).

The symptoms listed in §§ 12.04 and 12.06 must result in at least two of the following for the claimant to have a listed impairment: (1) marked restriction of activities of daily living, (2) marked difficulties in maintaining social functioning, (3) marked difficulties in maintaining concentration, persistence, or pace, or (4) repeated episodes of decompensation, each of extended duration. 20 C.F.R. pt. 404, subpt. P, app. 1 §§ 12.04(B), 12.06(B).[10]

Without addressing the symptoms listed in §§ 12.04 and 12.06, the ALJ found that Smith-Huffman's affective and anxiety disorders caused only mild restriction of activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no documented episodes of decompensation of extended duration, so that her mental impairments did not meet or equal a listed impairment. AR 24-25. The court finds that there is substantial evidence in the record to support the ALJ's finding. Although there is evidence that Smith-Huffman experienced sleep disturbance, decreased energy, feelings of guilt or

---

[10] Under § 12.06, a claimant may show complete inability to function independently outside the area of her home in lieu of showing two of the four limitations listed above. 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.06(C).

worthlessness, and difficulty concentrating or thinking, as well as symptoms of anxiety, the medical records do not support a finding that these symptoms resulted in the requisite functional limitations.

Beginning with the second limitation—difficulty maintaining social functioning—the record indicates that Smith-Huffman had difficulties in this area, but does not indicate that these difficulties were marked. Although Smith-Huffman testified that she had very few friends and did not go out in public very often, her physicians and mental health professionals consistently noted that she was a pleasant patient. Further, Dr. Kahn noted that Smith-Huffman experienced significant improvement in social interaction when she received regular therapy. AR 644. Finally, there is no indication that Smith-Huffman was unable to communicate with or interact with her numerous treatment providers, supporting the ALJ's conclusion that the limitation on her ability to maintain social functioning was no greater than mild.

With respect to the third limitation—difficulty in maintaining concentration, persistence, or pace—the record shows that Smith-Huffman had only moderate difficulties. Smith-Huffman complained of memory loss, confusion, and difficulty maintaining concentration, but several mental health professionals commented that they did not observe serious difficulties in these areas. In 2003, Dr. Giridhar noted that Smith-Huffman was able to provide her personal, family, and medical history in great detail. AR 351. In 2005,

Miller observed that Smith-Huffman was able to track her thoughts to their logical conclusions and observed no evidence of memory dysfunction. AR 570. Even where memory and concentration problems were noted, they were characterized as mild or moderate. Memory tests conducted in 2003 suggested mild to moderate memory impairment. AR 237. Neuropsychological testing performed in 2005 showed a mild impairment in terms of speed-of-information processing and overall memory capacity in the dull normal range. AR 541-43. Finally, Appletoft indicated in 2005 that Smith-Huffman's thoughts were disorganized but clear and that her memory appeared to be impaired, but did not indicate that this impairment was serious. AR 633. These medical records provide substantial support for the ALJ's conclusion that Smith-Huffman did not experience marked difficulties in maintaining concentration, persistence, or pace.

With respect to the fourth limitation—episodes of decompensation—the record does not indicate that Smith-Huffman experienced repeated episodes of decompensation, each of extended duration, caused by her mental impairments. Episodes of decompensation are "exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning." 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.00(C)(4). These episodes may be inferred from medical records showing significant alteration in medication or documentation of the need for a more structured psychological support system.

Id. And, "repeated episodes of decompensation, each of extended duration" means 3 episodes within 1 year, each lasting for at least 2 weeks. Id. Smith-Huffman does not point to, and the court is unable to find, any indication in the record that Smith-Huffman experienced increases in her affective and/or anxiety disorder symptoms that necessitated significant changes in medication, hospitalization, or placement in another structured setting at a frequency of 3 times a year. This provides substantial support for the ALJ's conclusion that Smith-Huffman did not experience the requisite episodes of decompensation.

The court finds that Smith-Huffman's affective and anxiety disorders did not result in marked difficulties in maintaining social functioning, marked difficulties in maintaining concentration, persistence, or pace, or repeated episodes of decompensation of extended duration. As a result, Smith-Huffman cannot show that her mental impairments resulted in two of the four conditions listed in § 12.04(B) and § 12.06(B).[11] Thus, the ALJ's conclusion that Smith-Huffman's mental impairments do not meet or equal a listed impairment is supported by substantial evidence in the record.

## II.    Determination of Residual Functional Capacity

Next, Smith-Huffman argues that the Commissioner erred in determining her RFC. Specifically, she argues that the Commissioner failed to grant

---

[11] As a result, it is unnecessary for the court to determine whether substantial evidence supports the ALJ's finding that the restriction of activities of daily living was mild.

appropriate deference to Dr. Mohan's opinions and erred in finding Smith-Huffman's subjective complaints not fully credible.

### A.    Weight Given to Opinion of Treating Physician

A treating physician's opinion on the nature and severity of the claimant's impairments is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2006).  "A treating physician's opinion 'do[es] not automatically control, since the record must be evaluated as a whole.' "  Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (quoting Bentley v. Shalala, 52 F.3d 784, 786 (8th Cir. 1995)).  An ALJ's decision to discount or disregard the opinion of a treating physician may be upheld where "other medical assessments 'are supported by better or more thorough medical evidence,' or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions."  Id. (citing Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000)).  Even if a treating physician's opinion is not entitled to controlling weight, it is entitled to deference and must be weighed using all of the factors provided in the regulations.  Policy Interpretation Ruling Titles II and XVI: Giving Controlling Weight to Treating Source Medical Opinions, Soc. Sec. Rul. (SSR) 96-2p (1996).  These factors are: length of the treatment relationship and the frequency of examination, nature and extent of

the treatment relationship, supportability, consistency, specialization, and other factors. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). The ALJ must always give good reasons for the weight afforded to a treating physician's evaluation. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

The ALJ explicitly rejected the disability opinions given by Dr. Mohan because they were conclusory, inconsistent with the frequency with which Smith-Huffman saw Dr. Mohan and the level of treatment rendered by Dr. Mohan, and not supported by clinical reports containing discussions of specific limitations that would render Smith-Huffman totally incapable of work. AR 31-32. According to the ALJ, Dr. Mohan's initial report from July 1, 2003, did not discuss details of her examination of Smith-Huffman, clinical findings, or functional limitations that would support her opinion that Smith-Huffman was completely disabled. Thus, the ALJ found this opinion to be conclusory. Dr. Mohan's letter dated May 24, 2004, also did not contain any discussion of functional restrictions that would explain why Smith-Huffman remained disabled from work. Dr. Mohan's reference to "significant pain and fatigue" indicated reliance on Smith-Huffman's subjective complaints. The ALJ rejected Dr. Mohan's September 12, 2005, opinion that Smith-Huffman's ability to stand, bend, twist, lift, and kneel was limited because Dr. Mohan had not seen Smith-Huffman between May 2004 and September 2005. Further, Dr. Mohan's reference to flares of fibromyalgia was inconsistent with the fact that Smith-

Huffman did not seek treatment from Dr. Mohan between May 2004 and September 2005. Finally, the ALJ declined to assign weight to Dr. Mohan's November 11, 2005, letter because it was simply repetitive of her previous letters or statements, it contained no discussion of specific limitations, and clinical progress reports did not establish that Smith-Huffman suffered flares of fibromyalgia.

The court finds that substantial evidence in the record supports the ALJ's decision that Dr. Mohan's opinions were not entitled to controlling weight. Dr. Mohan's opinion that Smith-Huffman was disabled from work is not supported by clinical records discussing specific limitations. On July 1, 2003, Dr. Mohan conducted physical, cardiovascular, respiratory, and musculoskeletal exams. She found that Smith-Huffman had 12 of 18 tender points that were positive for fibromyalgia. AR 438. Dr. Mohan concluded that Smith-Huffman was completely disabled and unable to work given her current symptoms, but she did not discuss any specific physical or mental limitations caused by Smith-Huffman's fibromyalgia. AR 438. Similarly, Dr. Mohan's notes on follow-up appointments on October 13, 2003, November 5, 2003, March 22, 2004, and May 19, 2004, reflect that Dr. Mohan encouraged Smith-Huffman to increase her exercise, but do not reflect any specific physical or mental limitations. AR 465, 471-72, 526. Thus, Dr. Mohan's opinion that Smith-Huffman is disabled from work and cannot stand, sit, walk, kneel, bend,

twist, lift, or crouch, is not supported by findings recorded in the medical records.  The ALJ is entitled to give little weight to statements of opinion by a treating physician that consist of nothing more than vague, conclusory statements.  Piepgras v. Chater, 76 F.3d 233, 236 (8th Cir. 1996).

Additionally, the frequency with which Dr. Mohan treated Smith-Huffman is inconsistent with her opinion that Smith-Huffman suffers from flares of fibromyalgia that make her unable to be substantially gainfully employed with any type of work.  In the letters dated September 12, 2005, and November 11, 2005, Dr. Mohan indicated that Smith-Huffman suffers flares of lupus and fibromyalgia that affect her ability to stand, sit, walk, kneel, bend, twist, lift, and crouch.  AR 620.  Dr. Mohan wrote these letters after seeing Smith-Huffman for the first time in 15 months.  The ALJ is entitled to interpret the fact that Smith-Huffman did not seek treatment from Dr. Mohan from May 2004 until September 2005[12] as evidence that her symptoms of fibromyalgia

---

[12] In the interim, Smith-Huffman sought treatment from Dr. Viola from November 2004 through May 2005, had her medications adjusted by her primary care provider on May 13, 2005, and saw Dr. Eckhoff in July 2005.  Dr. Eckhoff agreed with Dr. Mohan's diagnosis of fibromyalgia, but focused his examination on Smith-Huffman's skin condition.  AR 612-13.  The ALJ did not discuss this treatment when explaining why he rejected Dr. Mohan's opinion, but he did acknowledge Dr. Viola's and Dr. Eckhoff's treatment in other parts of his decision.  AR 35.  This suggests that the ALJ was aware that Smith-Huffman sought treatment from other physicians and still believed that Smith-Huffman's failure to seek treatment for several months rendered Dr. Mohan's account of her symptoms inconsistent with the record.  See Craig v. Apfel, 212 F.3d 433, 436 (8th Cir. 2000) ("Although required to develop the record fully and fairly, an ALJ is not required to discuss all the evidence submitted, and an

were not as severe and debilitating as Dr. Mohan's letters suggested.  See

Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995) ("[F]ailure to seek medical

treatment may be inconsistent with a finding of disability.").  Additionally,

Smith-Huffman herself testified that her fibromyalgia had become more

tolerable by the time of the hearing than it was when she first began

experiencing symptoms.  AR 723.  Thus, the ALJ could properly discredit

Dr. Mohan's opinion that Smith-Huffman was totally disabled from work as

inconsistent with the other evidence in the record.  The court finds that the

ALJ considered all of the relevant factors with respect to Dr. Mohan's treatment

of Smith-Huffman, and gave good reasons for affording her opinion little

weight.[13]  As a result, the ALJ did not err in failing to give proper deference to

Dr. Mohan's opinion.

### B. Credibility Determination

Smith-Huffman also challenges the ALJ's finding that her testimony was

not fully credible.  In weighing a claimant's subjective complaints of pain, the

ALJ should analyze the factors set out in Polaski v. Heckler, 739 F.2d 1320,

---

ALJ's failure to cite specific evidence does not indicate that it was not
considered." ).

[13] The ALJ's determination of Smith-Huffman's RFC shows that he gave
Dr. Mohan's opinions some weight.  He found that Smith-Huffman cannot
perform work that requires more than occasional stair/ramp climbing,
balancing, stooping, kneeling, crouching, or crawling, which incorporates
several of the limitations Dr. Mohan noted in her September 12, 2005, and
November 11, 2005, opinions.

1322 (8th Cir. 1984). Under Polaski, "[t]he adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: 1. the claimant's daily activities; 2. the duration, frequency and intensity of the pain; 3. precipitating and aggravating factors; 4. dosage, effectiveness and side effects of medication; 5. functional restrictions." Id.; see also Choate v. Barnhart, 457 F.3d 865, 871 (8th Cir. 2006). Additional considerations include the claimant's relevant work history and the absence of objective medical evidence to support the severity of claimant's symptoms. See Choate, 457 F.3d at 871. Without more, lack of objective medical evidence does not support discounting a claimant's subjective complaints. See Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005).

After considering the Polaski factors, the ALJ must make an "express credibility determination." Masterson v. Barnhart, 363 F.3d 731, 738 (8th Cir. 2004). Inconsistencies between the claimant's subjective complaints and the evidence as a whole may warrant an adverse credibility finding. See Pelkey v. Barnhart, 433 F.3d 575, 578 (8th Cir. 2006). The ALJ must, however, state why the record as a whole supports an adverse credibility determination. See Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006). "[T]he duty of the court is to ascertain whether the ALJ considered all of the evidence relevant to the

plaintiff's complaints of pain under the <u>Polaski</u> standards and whether the evidence so contradicts the plaintiff's subjective complaints that the ALJ could discount his or her testimony as not credible." <u>Masterson</u>, 363 F.3d at 738-39. The court "will not disturb the decision of an ALJ who considers, but for good cause discredits, a claimant's complaints of disabling pain." <u>Goff</u>, 421 F.3d at 792 (internal quotation omitted).

Here, the ALJ considered each <u>Polaski</u> factor and found that the credibility of Smith-Huffman's testimony regarding her symptoms and functional restrictions was weakened by the level of daily activities reflected in the record, the lack of specific functional restrictions discussed by her treating physicians, and the steps she and her husband had taken to obtain government assistance. AR 39. The court finds that the ALJ considered all of the relevant evidence and could fairly conclude that this evidence contradicted Smith-Huffman's subjective complaints.

With respect to Smith-Huffman's past work record, the ALJ found that the earnings she reported on her Social Security record for the years 1997, 2000, and 2001 were inconsistent with earlier reports to the Social Security Administration that she worked 40 hours a week during those years. AR 32-33. The ALJ properly relied on this inconsistency in making his credibility determination.

With respect to Smith-Huffman's daily activities, the ALJ pointed out several inconsistencies that discredited Smith-Huffman's testimony that she was unable to function 12 days a month. First, the ALJ noted that Smith-Huffman stayed home alone most days. According to the testimony of Smith-Huffman and her witnesses, her husband was away during the week and her son was away at school during the day. Although Murray testified that she frequently checked on Smith-Huffman during the day, the testimony does not establish that she frequently found Smith-Huffman in a disoriented condition or had to do household chores because Smith-Huffman was nonfunctional. AR 33. Second, Smith-Huffman's testimony that she was housebound is not reflected in the clinical records or consistent with Murray's testimony that Smith-Huffman left the house for appointments, shopping, and dining out. AR 33. Third, Smith-Huffman's testimony that she was unable to concentrate and stay focused on tasks because of pain or depressive symptoms was inconsistent with her testimony that she was able to play blocks with her monkeys and do biofeedback and other exercises on the computer. AR 34. Fourth, Smith-Huffman's testimony that she must nap twice a day was inconsistent with her report to a psychologist that she takes breaks for only 20 to 30 minutes at a time. AR 34. Finally, the ALJ found highly significant the testimony of Smith-Huffman and her husband that he lives away from the home to ensure that Smith-Huffman remains eligible for government benefits.

This testimony suggests either that Smith-Huffman is not reliant on her husband for daily activities or that Smith-Huffman is willing to go to the extreme to gain assistance from social services, including misstating her symptoms and functional limitations in order to obtain social security benefits. AR 34. While the court may have interpreted Smith-Huffman's testimony differently, "[t]he credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts," and the ALJ properly relied on these facts to determine Smith-Huffman's credibility. See Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001).

With respect to the duration, frequency, and intensity of Smith-Huffman's pain, the ALJ found that Smith-Huffman's complaint of a persistently severe level of pain resulting from fibromyalgia was inconsistent with the level of medical attention she sought. Smith-Huffman did not see Dr. Mohan between May 2004 and September 2005. In the interim, Smith-Huffman saw Dr. Viola, who in November 2004 administered intravenous steroids that resulted in dramatic improvement for one month, but Smith-Huffman did not return to Dr. Viola after March 2005. The ALJ concluded that Smith-Huffman's testimony that she experienced severe flares of fibromyalgia was inconsistent with the following: the fact that she failed to seek medical treatment between March 2005 and September 2005, Dr. Mohan's September 2005 observation that Smith-Huffman's symptoms had remained stable since

May 2004, and the fact that Smith-Huffman did not return to Dr. Viola after March 2005. AR 35. The court notes that Smith-Huffman presented to her primary care provider on May 12, 2005, complaining of increased fatigue, low energy, abdominal discomfort, and increased depression, and that Dr. Reid Holkesvik adjusted Smith-Huffman's medication the next day. AR 594-95. Still, Smith-Huffman did not seek medical attention for issues relating to fibromyalgia between May 2005 and September 2005.[14] It is inconsistent with the degree of pain asserted where no evidence exists that the claimant attempted to find medical treatment for alleged pain and disability. See Murphy, 953 F.2d at 386-87. Thus, the ALJ properly considered Smith-Huffman's failure to seek medical treatment for pain associated with fibromyalgia for part of 2005.

The ALJ also found Smith-Huffman's testimony regarding her depressive symptoms inconsistent with her report to Dr. Eckhoff in July 2005 that her depression was well-controlled and with the lack of evidence that she maintained contact with mental health professionals at the time of the ALJ's decision. AR 35. Although the record reflects that Smith-Huffman reported depressive symptoms to other treatment providers, the ALJ properly considered her statement to Dr. Eckhoff in determining her credibility.

_____

[14] Smith-Huffman's visit with Dr. Eckhoff in July 2005 focused on her skin condition, not her symptoms of fibromyalgia.

With respect to precipitating and aggravating factors, the ALJ found that Smith-Huffman could have controlled her pain and depressive symptoms through mental health intervention, medication, and exercise.  AR 36.  The court finds the ALJ's determination supported by the records of Dr. Mohan and Dr. Eckhoff noting recommendations of low-impact exercise and stress management techniques.  With respect to Smith-Huffman's medications, the ALJ noted that her alleged fatigue was likely the result of overmedication.  But he also found that the fact that Smith-Huffman was not taking any pain medication because she did not want to be rendered nonfunctional inconsistent with her complaints of debilitating pain.  AR 37.  It is true that "[a] lack of strong pain medication is inconsistent with subjective complaints of disabling pain."  Murphy, 953 F.2d at 386.  While it would be reasonable to interpret the primary care provider's conclusion that Smith-Huffman was overmedicated as evidence going against the general proposition that failure to take pain medication is inconsistent with complaints of severe pain, the ALJ could properly conclude that Smith-Huffman's testimony that she did not want to take pain medication because it rendered her nonfunctional was inconsistent with her testimony that she suffered severe pain and was nonfunctional for 12 days a month.

Finally, with respect to functional limitations, the ALJ noted a number of inconsistencies that undermined the credibility of Smith-Huffman's testimony

that she had 12 bad days a month and required 2 naps a day on good days. First, Smith-Huffman testified that she cared for her pets, suggesting that she was capable of some activity. Second, no medical record supported Smith-Huffman's testimony that she was only able to complete 15 ½ hours of community service through TANF. Third, no medical record documented Smith-Huffman's condition on a "bad day." Finally, Smith-Huffman's testimony that she and her husband lived separately so she could maintain eligibility for government benefits raised serious questions about the credibility of her allegations of pain and functional limitations. AR 38. Again, even if the court would evaluate Smith-Huffman's credibility differently, the ALJ could properly consider these facts in rejecting Smith-Huffman's subjective complaints. See Curran-Kicksey v. Barnhart. 315 F.3d 964, 968 (8th Cir. 2003) ("The lack of supporting objective medical evidence may be used as one factor to be considered in evaluating the credibility of testimony and complaints.").

Based on the ALJ's discussion of the Polaski factors, the court finds that his determination that Smith-Huffman was not fully credible is supported by substantial evidence. Accordingly, the court finds that the ALJ did not err in his credibility determination.

### III.  Determination that Smith-Huffman Can Perform Unskilled Sedentary Work

Smith-Huffman's final argument is that the ALJ erred in determining that she can perform unskilled and sedentary work.  As explained above, the ALJ did not err in determining the weight to be given to Dr. Mohan's opinion and the credibility of Smith-Huffman's testimony, so his determination of Smith-Huffman's RFC is supported by substantial evidence in the record. Thus, the ALJ properly relied on the testimony of the vocational expert that there are jobs in the national economy that Smith-Huffman is capable of performing.  See Forte v. Barnhart, 377 F.3d 892, 897 (8th Cir. 2004) (holding that the ALJ must include the work-related limitations that he found credible in hypothetical question to vocational expert).

Based on the foregoing, it is hereby

ORDERED that the Commissioner's decision denying Smith-Huffman's claim for disability insurance benefits is affirmed.

IT IS FURTHER ORDERED that the Commissioner's decision denying Smith-Huffman's claim for supplemental security income is affirmed.

Dated March 20, 2009.

BY THE COURT:


/s/ *Karen E. Schreier*
KAREN E. SCHREIER
CHIEF JUDGE